## Commonwealth *vs.* Benjamin Laguer.

No. 05-P-155.

Worcester. November 10, 2005. - March 2, 2006.

Present: Greenberg, Berry, & Graham, JJ.

Further appellate review granted, 447 Mass. 1101 (2006).

*Evidence,* Exculpatory, Fingerprints. *Due Process of Law,* Disclosure of evidence. *Practice, Criminal,* Disclosure of evidence, New trial.

Discussion of the government's constitutional obligation timely to disclose to a criminal defendant favorable evidence in its possession that could materially aid the defense against the pending charges [617-619], and statement of the standard of review that an appellate court employs in reviewing a trial court judge's determination of a motion for a new trial brought on that basis [619].

A trial court judge did not err in denying a criminal defendant's motion for a new trial, brought on the ground that the Commonwealth had failed timely to disclose to the defense certain allegedly exculpatory evidence (a fingerprint report), where the report was cumulative of other evidence admitted at trial and essentially confirmed information that had been directly conveyed to the defendant's counsel prior to trial, and where the report did not contain information that would have cast doubt on the victim's positive identification of the defendant, or cleared the defendant of involvement in the attack [619-622]; similarly, the Commonwealth's destruction or loss of the actual fingerprints or the back page of the fingerprint report did not violate the defendant's due process rights [622-623].

Indictments found and returned in the Superior Court Department on August 4, 1983.

A motion for a new trial, filed on February 11, 2004, was heard by *Timothy S. Hillman,* J., and a motion for reconsideration was considered by him.

*James C. Rehnquist (Joshua L. Stayn & Nicholas D. Gray* with him) for the defendant.

*Sandra L. Hautanen,* Assistant District Attorney, for the Commonwealth.

GRAHAM, J. In January, 1984, a Superior Court jury convicted the defendant, Benjamin Laguer, on four indictments charging him with the crimes of robbery, breaking and entering, assault and battery, and aggravated rape.[1] The indictments stemmed from a brutal attack and sexual assault of a fifty-nine year old woman while she was alone in her Leominster apartment. On appeal, this court upheld the convictions.[2]

The principal issue at the trial was the identification of the assailant. Prior to trial, the defendant requested the disclosure of all exculpatory evidence, including fingerprints found in the victim's apartment. Approximately one month prior to trial, the prosecutor notified defense counsel by telephone that the Leominster police had lifted a partial fingerprint from the base of a telephone in the victim's apartment. The cord from the telephone had been used to bind the victim's hands. The prosecutor disclosed that the fingerprint was analyzed and was not a match to any of the defendant's fingerprints. He further indicated that when he received the written report itself (prepared by the State police laboratory) he would immediately provide it to defense counsel. The report, however, was not produced.

On June 21, 2001, nearly seventeen years after the defendant was convicted, he requested, through new counsel, that the office of the district attorney and the director of the State police crime laboratory provide him with documents related to fingerprints collected by the prosecution in connection with his trial. The Commonwealth, on November 15, 2001, produced the front page of a fingerprint report dated July 15, 1983 (fingerprint report). The fingerprint report indicated that four fingerprints (not one, as had been reported previously) had been lifted from the base of the victim's telephone, and none matched the fingerprints of the defendant. The back page of the fingerprint report, as well as the actual fingerprints, were missing.

---

[1] The judge sentenced the defendant to serve a life term in State prison on the rape conviction. On the robbery and breaking and entering convictions, the judge imposed concurrent sentences of twelve to fifteen years. With the defendant's consent, the conviction on the assault and battery indictment was placed on file; for this procedure, see *Commonwealth* v. *Simmons, ante* 274, 278-284 (2005).

[2] The defendant's assignments of error were answered in our opinion in *Commonwealth* v. *Laguer*, 20 Mass. App. Ct. 965 (1985).

In February, 2004, represented by another new counsel, the defendant filed a motion in Superior Court seeking a new trial, or entry of an order dismissing the indictments.[3] In the motion, the defendant argues that the prosecution's failure to disclose exculpatory evidence, i.e., the fingerprint report, resulted in a violation of his Federal and State due process rights and required a new trial. He contends that had the Commonwealth timely disclosed the fingerprint report, defense counsel could have used it at trial to impeach the victim's identification, and to substantiate his mistaken identity theory by establishing the presence of another person at the crime scene. He also claims that since the back page of the fingerprint report, as well as the actual fingerprints, have been lost or destroyed, dismissal of the indictments, rather than a new trial, is the appropriate remedy.

The motion for a new trial was argued before a judge of the Superior Court, who was not the judge who had presided at the defendant's 1984 trial. The motion judge denied the requested relief as well as the defendant's subsequent motion for reconsideration. We affirm.

1. *The July, 1983, fingerprint report.* The fingerprint report is dated July 15, 1983, just two days after the incident. As it currently exists, the fingerprint report is comprised of a single (one-sided) page. The fingerprint report was signed by "Tpr. Arthur Martin" and contains some basic facts respecting the crime: it was a "rape" in Leominster, and the police investigator was "Det. Ron Carrigan." It identifies the victim.

The fingerprint report indicates "4" "latent" fingerprints were lifted from the "base of the trimline phone" (which had been found in the victim's home). In the part of the fingerprint report entitled "Added Information (If Needed)," the following is set forth:

"On 7/15/83 at approx 2:30 pm Det. Carrigan brought a beige colored base of a telephone to the lab to be examined for prints. Several prints were lifted and a comparison

---

[3]Postjudgment, the defendant raised different grounds than those asserted presently for claiming a new trial or other relief. See, e.g., *Commonwealth* v. *Laguer,* 410 Mass. 89 (1991); *Commonwealth* v. *Laguer,* 36 Mass. App. Ct. 310 (1994). His prior motions for a new trial are not pertinent to the present appeal.

made with a suspect Benjamin Laguer 5/1/63 with neg results. On 7/16/83 a 9:15 Det Carrigan was informed via telephone."[4]

2. *Trial evidence.* A jury could have found the following facts. On July 12, 1983, at approximately 9:00 P.M., a man broke into the victim's apartment and assaulted her. The man was described as wearing jogging shorts and mismatched "gym" socks with stripes at the top.

Immediately upon his entering the apartment, and thereafter, the intruder forced the victim to submit to repeated and forcible acts of vaginal intercourse, sodomy, and fellatio. He repeatedly beat the victim and also robbed her, stealing jewelry, money, and a pocketbook. All of this occurred over about an eight-hour time period, ending at about 5:00 A.M. the next day (July 13).

At some point the assailant placed a plastic bag over the victim's head, causing her to pass out. She eventually came to but was dazed and in shock from the violent events. While the bag was over her head, the victim "fought" and struggled to some extent with the assailant. The victim was found to have bloody fingernails and blood on her hand, apparently from scratching the assailant.

During the incident, the victim was able to observe the face of her assailant.[5] Before leaving her apartment, he threatened the victim that if she identified him, he would kill her. The victim was ultimately discovered by the police with her wrists bound together behind her back with a cord from the telephone in her apartment. Her feet were bound up with a cord from a portable hair dryer device. She had suffered serious physical injuries in the course of the attack.

It was not disputed that as of July, 1983, the defendant was living (with his father) in the same Leominster apartment complex where the victim made her home. The defendant lived in apartment 101, which was immediately adjacent to the victim's own unit (apartment 102).

[4]The fingerprint report contains other typed language, "(Over for Additional)," but no other page or record was produced by the Commonwealth.

[5]The defendant challenged the victim's mental state and her ability to see, with any clarity, the face of her assailant. The parties disputed the amount and quality of light (from an outside lighting source) that could have illuminated the inside of the victim's apartment.

The victim identified the defendant as the perpetrator of the crimes. She recalled having seen the defendant on a prior occasion when he rang her doorbell in order to gain access to the common hallway inside the building. The victim also informed an investigating officer, Leominster police Detective Ronald Carignan, that she had seen the defendant using a key to go into apartment 101.

After having obtained a search warrant, Detective Carignan conducted a search of the defendant's apartment. Among the items of clothing observed in the apartment were several pairs of tube socks. The socks were rolled up in pairs but did not match. On the morning of July 15, Carignan returned to the apartment. The defendant answered the door, clad only in jogging shorts and tube socks. He was not wearing a shirt.

Accompanied by Carignan, the defendant went to the Leominster police station. He was advised of his Miranda rights. The defendant permitted police to photograph him and take his fingerprints. Carignan observed that the defendant had a very deep scratch on his back. This scratch was photographed, and the photographs were later shown to the jury.[6]

While in the hospital, the victim identified the defendant from a photographic array displayed by the police.[7] Just prior to trial, she was shown the same array of photographs and again selected the defendant's picture. At trial, the victim again selected the defendant's picture from a photographic array.[8]

In the course of a search of the victim's apartment for evidence, Carignan recovered a fingerprint from the base of the victim's telephone and caused it to be sent to the State police laboratory for further analysis. At trial, Carignan testified that he did not find any fingerprints in the victim's apartment that matched the defendant's fingerprints. The police recovered bloodstained items from the crime scene and forwarded that

---

[6]The defendant first said the scratch was due to a nail at a bar; he later said that it was from splinters or nails on a picnic table.

[7]Initially, when the police first asked her if she could identify the assailant, the victim answered no. At trial, she explained that she had answered as she did because the defendant had threatened to take her life.

[8]During cross-examination, the victim acknowledged that she used eyeglasses for close reading, and that she had not used her eyeglasses when viewing the photographs at the hospital.

evidence (with the defendant's saliva sample) to the State police for a chemical analysis. A subsequent police report indicated that an "inconclusive" blood-type result was obtained from the defendant's saliva sample.[9]

At trial, each witness called by the defendant placed the defendant away from the crime scene during the eight-hour period of the attack. The defendant testified and flatly denied having committed the crimes charged.

Throughout the trial, the defendant pressed an argument to the jury that another man had committed the crimes, identifying a particular man of Hispanic descent who also lived at the same Leominster apartment complex as being the likely culprit. In a like vein, the defendant's counsel drove the point home to the jury during closing argument that there was no physical evidence that linked the defendant to the crime scene.

3. *Due process.* Due process of law requires that the government timely "disclose to a criminal defendant favorable evidence in its possession that could materially aid the defense against the pending charges." *Commonwealth* v. *Daniels,* 445 Mass. 392, 401 (2005), quoting from *Commonwealth* v. *Tucceri,* 412 Mass. 401, 404-405 (1992). This constitutional rule has been articulated in a series of United States Supreme Court decisions[10] dating back to *Brady* v. *Maryland,* 373 U.S. 83, 87 (1963), as well as in decisions of the Supreme Judicial Court and this court. See, e.g., *United States* v. *Agurs,* 427 U.S. 97, 103-104 (1976); *Banks* v. *Dretke,* 540 U.S. 668, 691 (2004);

---

[9]Unknown at that time was the fact that the defendant had intentionally tampered with his court-ordered saliva sample, mixing his own with that of another inmate. The defendant admitted to this in 2003 (nearly twenty years after the trial) at a parole board hearing.

[10]The Supreme Judicial Court has declined to adopt the Supreme Court's formulation of a unitary standard for all such prosecutorial nondisclosure cases, which was set forth in *United States* v. *Bagley,* 473 U.S. 667, 682 (1985) (evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"; " 'reasonable probability' is a probability sufficient to undermine confidence in the outcome"). The Supreme Judicial Court adheres to *United States* v. *Agurs,* 427 U.S. 97 (1976), which had formulated a more favorable standard to a defendant for purposes of establishing a due process violation when the defendant has made a specific request for certain evidence. See *Commonwealth* v. *Gallarelli,* 399 Mass. 17, 21 n.5 (1987); *Commonwealth* v. *Tucceri,* 412 Mass. at 405-406.

*Commonwealth* v. *Gregory*, 401 Mass. 437, 442 (1988); *Commonwealth* v. *Healy*, 438 Mass. 672, 678-679 (2003); *Commonwealth* v. *Daniels*, 445 Mass. at 401-405; *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. 435, 439-440 (1992); *Commonwealth* v. *Bennett*, 43 Mass. App. Ct. 154, 158-163 (1997).[11]

For a constitutional violation to be established due to the prosecution's failure to make disclosure, " '[f]avorable evidence' need not be dispositive evidence." *Commonwealth* v. *Daniels*, 445 Mass. at 401. "Evidence may be favorable or exculpatory,[12] and thus required to be disclosed, 'although it is not absolutely destructive of the Commonwealth's case or highly demonstrative of the defendant's innocence.' " *Ibid.*, quoting from *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 (1978).

The prosecution's duty to make disclosure to a defendant is straightforward. The prosecution must disclose evidence, in its possession or under its control, "which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Commonwealth* v. *Ellison*, 376 Mass. at 22. See *Commonwealth* v. *Healy*, 438 Mass. at 679. That said, it remains the defendant's burden to show prejudice warranting or

---

[11]The *Brady* rule does not require the prosecution to gather evidence that is potentially helpful to the defense, or prescribe a methodology of investigation that the police must follow. See *United States* v. *Agurs*, 427 U.S. at 109-110.

Also to be distinguished from this case is the situation of a motion pursuant to Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001), based on newly-discovered evidence. See *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986); *Commonwealth* v. *Trung Chi Truong*, 34 Mass. App. Ct. 668, 673 (1993). Here, the motion judge seemed to treat the defendant's present motion as raising an issue of newly discovered evidence. To the extent he did so, the motion judge was in error; in the end, however, the motion judge (albeit indirectly) identified the correct standard, concluding that if the fingerprint report had been timely disclosed, the evidence would not have influenced the jury's deliberations.

[12]The term "exculpatory" in this context is not understood to connote only alibi or such other complete proof of innocence, but covers all evidence that has a tendency to "negate the guilt of the accused" or support the accused's innocence. *Commonwealth* v. *Healy*, 438 Mass. at 679, quoting from *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261 n.6 (1980).

requiring a new trial. *Commonwealth* v. *Tucceri*, 412 Mass. at 404 n.2.

4. *Standard of review*. Because the defendant had requested the Commonwealth to produce fingerprint evidence, it follows that he "need only demonstrate that a substantial basis exists for claiming prejudice from the nondisclosure." *Id*. at 412. Such a basis exists if undisclosed evidence, responsive to a specific defense request, "might have affected the outcome of the trial." *Id*. at 405, quoting from *United States* v. *Agurs*, 427 U.S. at 104. This is a more favorable standard to a defendant than the situation where either no request has been made by a criminal defendant, or it has been made in such generalized terms that the prosecution cannot be deemed to have been put on notice of a defense request for a particular piece of evidence.[13] *Commonwealth* v. *Tucceri*, 412 Mass. at 413.[14] See *Commonwealth* v. *Daniels*, 445 Mass. at 404 n.23 (explaining different standards of review in case such as this).

When a new trial motion is constitutionally based, as is the case here, a reviewing court "will exercise its own independent judgment on the ultimate factual as well as legal conclusions." *Commonwealth* v. *Tucceri*, 412 Mass. at 409. See *Commonwealth* v. *Salvati*, 420 Mass. 499, 500 (1995); *Commonwealth* v. *Healy*, 438 Mass. at 678. In the circumstances of this case, no deference need be afforded to the findings of fact made by the motion judge below, or to his connected rulings of law. Measured by this framework, we turn to the merits of the defendant's due process claim.[15]

5. *Discussion*. In this case, the defendant has not established

---

[13]In that case, in order to prevail, a defendant must show there is a "substantial risk that the jury would have reached a different conclusion if the evidence had been admitted." *Commonwealth* v. *Tucceri*, 412 Mass. at 413.

[14]"[A] standard of prejudice more favorable to the defendant is justified in order to motivate prosecutors to be alert to defendants' rights to disclosure." *Commonwealth* v. *Tucceri*, 412 Mass. at 407.

[15]The Commonwealth argues that the defendant's due process claim has been waived. We do not agree. The defendant's claim was not "generally known and available at the time of trial or [during his initial] appeal." *Commonwealth* v. *Healy*, 438 Mass. at 677, quoting from *Commonwealth* v. *Valliere*, 437 Mass. 366, 370 (2002). The defendant had no reason to believe, prior to trial or on direct appeal, that the Commonwealth had in its possession or control the undisclosed fingerprint report. The inquiry we must make "is

that "a substantial basis exists for claiming prejudice from the nondisclosure." *Commonwealth* v. *Tucceri*, 412 Mass. at 412. We conclude that even had the fingerprint report been timely produced, it would not have affected the outcome of the trial. *Id.* at 412-413. Accord *Commonwealth* v. *Daye*, 411 Mass. 719, 729 (1992); *Commonwealth* v. *Healy*, 438 Mass. at 680.

First, the fingerprint report is cumulative of other evidence admitted at trial that established, indisputably, that there was an absence of physical evidence at the scene linking this defendant to the crimes. See *Commonwealth* v. *Tucceri*, 412 Mass. at 414 ("[i]f the undisclosed evidence is cumulative, . . . the failure to disclose that evidence does not warrant the granting of a new trial").

In particular, the jury were informed that a fingerprint from the same telephone was shown not to have matched the defendant's fingerprints. Because the fingerprint report refers to four fingerprints, the additional nonmatching fingerprints arguably bolster the point that the defendant's fingerprints were not identified on the telephone.[16] Failure to disclose the fingerprint report did not handicap the defendant's ability to argue to the jury that the victim had misidentified him, a claim he made throughout the trial from several different angles.[17]

Second, nothing in the report demonstrates, or even suggests, that the defendant had not been at the scene or had not committed the crimes charged. The report does not add new informa-

---

whether we can be confident that, even if the prosecution had supplied the report to the defendant[] in timely fashion, the report or available evidence disclosed by it would not have influenced the jury." *Commonwealth* v. *Daye*, 411 Mass. 719, 729 (1992).

It need not be emphasized that the prosecution ought not to have withheld the fingerprint report. A criminal trial is not a game. The objective of prosecutors must be the fair administration of justice, and not just obtaining a conviction. See *Commonwealth* v. *Tucceri*, 412 Mass. at 408; *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. at 435-436.

[16]The fingerprint report does not indicate whether the four fingerprints were from the same hand or from different hands.

[17]A defendant has a constitutional right to offer evidence that another individual may have committed the charged crime. *Commonwealth* v. *Conkey*, 443 Mass. 60, 66 (2004). "A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it." *Ibid.*, quoting from *Commonwealth* v. *Lawrence*, 404 Mass. 378, 387 (1989).

tion to call into question the victim's identification of the defendant as the perpetrator of the crimes charged. There is no information in the report as to the identity of the person whose fingerprints were on the telephone. It is only in the most general and speculative terms that the defendant claims to have suffered prejudice from the Commonwealth's nondisclosure. The defendant characterizes the fingerprint report as "potentially exculpatory"; however, given that he had been informed, prior to trial, of the results of the single fingerprint analysis, and given that he had in his sights at the time of trial the identity of one particular man, of Hispanic descent, who lived in the same Leominster apartment complex, no convincing showing has been made here that the defendant was handicapped in any material way in his defense against the charges. We are not persuaded that his trial strategy was materially affected due to the nondisclosure of the fingerprint report. We note that a month prior to the start of the trial, the defendant was aware of the existence of the single fingerprint yet proceeded to trial without obtaining or attempting to link the fingerprint to other possible perpetrators.

Third, in briefs filed with this court, the defendant's counsel have attempted to argue that the Commonwealth's physical evidence at trial was "inconclusive," and as such, a timely production of the fingerprint report could have aided the defense in its ability to cast doubt on the Commonwealth's case. This contention is spurious. References at trial to the "inconclusive" nature of physical evidence were directed to a chemical analysis of the defendant's saliva sample and blood evidence. A different State police laboratory report indicated that an "inconclusive" blood-type result was obtained from the defendant's saliva sample.[18]

The defendant now attempts to conflate two different tests, that is, the fingerprint evidence on the one hand, and the saliva and blood evidence on the other hand.[19] It is highly unlikely the jury would have been led to believe that the "inconclusive"

---

[18]Of course, it must be said the Commonwealth was not aware at trial that the defendant had purposefully tampered with his saliva sample, thereby preventing the police from carrying out a proper comparison of his blood type with the rape kit specimens and the many bloodstained items found at the scene of the crime. See note 9, supra.

[19]We decline the Commonwealth's invitation to consider the deoxyribo-

blood evidence had anything to do with the indisputable fact that no fingerprints were found at the scene that matched those of the defendant.

Any harm resulting from the failure to produce the fingerprint report here is markedly different in degree from the situation presented in those cases where a new trial has been ordered because of the prosecution's failure to make timely disclosure of exculpatory or favorable evidence to a defendant. See *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 22-24 (1987) (police report confirmed no trace of blood found on knife seized from defendant upon arrest for stabbing); *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998) (postmortem tests tending to disprove presence of drug in body of murder victim); *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. at 439-440 (detective indicated in initial report that there were two sets of footprints at crime scene but at trial testified that there were three sets of footprints; prosecution should have disclosed detective's change in statement); *Commonwealth* v. *Bennett*, 43 Mass. App. Ct. at 158-163 (evidence tending to show defendant could not have made telephone calls to victim after an attack because defendant was at that time detained in State correctional facility).

The fingerprint report, unlike those items of evidence at issue in the above cases, was cumulative of other evidence admitted at trial and essentially confirmed information that had been directly conveyed to the defendant's counsel prior to trial. The fingerprint report does not contain information that would have cast doubt on the victim's positive identification of the defendant, or cleared him from involvement with this attack. Compare *Commonwealth* v. *Brown*, 57 Mass. App. Ct. 852, 857-859 (2003) (undisclosed inventory report did not carry measure of strength to warrant ordering new trial).

For the same reasons, we are confident that the defendant's due process rights were not violated by the Commonwealth's destruction or loss of the actual fingerprints or any remaining page of the fingerprint report. We are unpersuaded by the

nucleic acid (DNA) test result, which is said to have pointed directly to the defendant's guilt. The DNA test, which was carried out at the request of the defendant after the trial, need not be addressed with regard to the motion at hand.

reasons set forth by the defendant in support of the relief requested in his motion.

The orders of the Superior Court denying defendant's motion for a new trial and related reconsideration motion are affirmed.

*So ordered.*