NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-1785                                        Appeals Court

COMMONWEALTH  vs.  BENJAMIN LAGUER.


No. 12-P-1785.

Worcester.      November 18, 2015. - January 29, 2016.

Present:  Cohen, Grainger, & Wolohojian, JJ.


Practice, Criminal, New trial.  Deoxyribonucleic Acid.



Indictments found and returned in the Superior Court
Department on August 4, 1983.

A motion for a new trial, filed on April 28, 2011, was
heard by Richard T. Tucker, J.


John H. LaChance for the defendant.
Sandra L. Hautanen, Assistant District Attorney, for the
Commonwealth.


GRAINGER, J.  On January 30, 1984, Benjamin Laguer was

convicted by a jury in Superior Court of unarmed robbery,

breaking and entering in the nighttime with intent to commit a

felony, assault and battery, and aggravated rape.[1]  On appeal

_____

[1] His convictions were affirmed by this court.  See
Commonwealth v. Laguer, 20 Mass. App. Ct. 965 (1985).

from a denial of the latest in a long series of motions[2] for a new trial, the defendant argues that the motion judge erred in finding that certain evidence, specifically testimony from the victim's caretaker and deoxyribonucleic acid (DNA) test results, did not warrant a new trial, and that he also erred in concurrently allowing the Commonwealth's motion to dismiss the defendant's latest motion for a new trial due to fraud on the court.

As was the case in previous motions considered in the Superior Court, then reviewed by this court and by the Supreme Judicial Court, the credibility of the defendant as well as that of the witnesses and the evidence presented on his behalf is central to the result. Accordingly we review the motion judge's recitation of findings, as well as the protracted history of this case, with emphasis on the degree of trustworthiness underlying the evidence proffered to support the defendant's claim "that justice may not have been done." Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001).

---

[2] The parties refer to this as the defendant's ninth motion for a new trial; eight other motions with that precise caption are not apparent on the record. Denials of his previous motions have been affirmed by this court and the Supreme Judicial Court. See Commonwealth v. Laguer, 410 Mass. 89 (1991); Commonwealth v. Laguer, 36 Mass. App. Ct. 310 (1994); Commonwealth v. Laguer, 46 Mass. App. Ct. 1108 (1999); Commonwealth v. Laguer, 65 Mass. App. Ct. 612 (2006); Commonwealth v. Laguer, 448 Mass. 585 (2007).

Background.  The trial.  The jury found that the defendant broke into the apartment of a fifty-nine year old woman, brutally assaulted her, and raped her over an eight-hour period. In so doing the jury rejected a defense of misidentification.

The identification evidence at trial was that the victim initially told the police she was unable to identify the perpetrator, only describing him as a short black male.  The following day, however, she told the police that her assailant was the defendant, who lived in the next door apartment.[3]  She also identified the defendant from a photograph array, and identified him as her assailant at trial.

Before trial, and because the victim had a history of mental health treatment, the defendant moved to obtain evidence of her mental health condition in order to determine her ability to testify.  The trial judge privately reviewed the victim's treatment records for the six-month period surrounding the attack and her identification of the defendant, and determined that the records provided no basis to question the victim's competency to testify.  However, the trial judge permitted the defendant to question the victim about her mental condition and

---

[3] The victim further testified that she had seen the defendant several times going into the apartment next door.  She also testified that she had not identified him initially because he had threatened to kill her if she did so.

any medication she was taking at the time of the attack and the identification.

No physical evidence linking the defendant to the crime scene was introduced at trial.[4] After a jury found him guilty of all charges, the defendant was sentenced to life on the rape charge and, on the other charges, received lesser sentences that ran concurrently with his life sentence.

Posttrial proceedings. Direct appeal. The defendant appealed his convictions, arguing that the trial judge committed an abuse of discretion in denying his request for a psychiatric examination of the victim, violated his constitutional right to confrontation, committed error in allowing the prosecutor's reference during closing arguments to apparently matching socks found in the victim's apartment and the defendant's apartment, committed error in not following the model alibi charge pursuant to Commonwealth v. McLeod, 367 Mass. 500, 502 n.1 (1975), and committed error in the identification evidence charge. This court affirmed the judgments of conviction. Commonwealth v.

---

[4] The police had collected several items stained with blood and bodily fluids at the scene of the crime. Tests conducted to match the defendant's blood type with any of the bodily fluids found at the scene were inconclusive. It was later learned that the defendant had deliberately contaminated the saliva sample obtained for the purpose of comparison with fluids obtained at the scene. Other physical evidence included fingerprints that were not the defendant's, found on the base of a telephone in the victim's apartment.

Laguer, 20 Mass. App. Ct. 965, 966 (1985). The Supreme Judicial Court denied the defendant's request for further appellate review. Commonwealth v. Laguer, 396 Mass. 1103 (1985).

Petition for a writ of habeas corpus. Subsequently, the defendant filed a petition for a writ of habeas corpus, which was summarily dismissed by the Federal District Court. See Laguer vs. Bender, U.S. Dist. Ct., No. 86-1237-WF (D. Mass. Nov. 8, 1988).

1989 motion for a new trial. On February 24, 1989, the defendant filed a motion for a new trial based on ineffective assistance of trial counsel, and also asserting that the jury were infected with racial bias. The defendant's claim of ineffective assistance related, at least in part, to trial counsel's failure to obtain a pretrial test of the defendant's blood type, a subject to which we shall return below. See note 4, supra; notes 10 and 11, infra. On direct appellate review the Supreme Judicial Court vacated the trial judge's denial of the motion for a new trial and remanded the case "solely for the purpose of conducting an evidentiary hearing and making a determination with respect to the truth of [a juror's] affidavit in so far as it describes ethnically oriented statements attributed to jurors." Commonwealth v. Laguer, 410 Mass. 89, 99 (1991). The affidavit in question, submitted by juror Nowick, "described the jury's deliberations as plagued by bigoted

remarks about the defendant, who was ethnically Hispanic." Commonwealth v. Laguer, 36 Mass. App. Ct. 310, 311 (1994).

On remand, the trial judge conducted an evidentiary hearing at which the defendant called four jurors, including Nowick, to testify. Under oath Nowick repudiated[5] most of the assertions in his affidavit. Id. at 312. After other witnesses made contradictory statements,[6] the judge found that no offending statements had been made, and also determined that Nowick had been subject to "serious lobbying by" the defendant's associates and had "bec[o]me personally involved in [the defendant]'s cause."[7] Accordingly the judge again denied the motion for a new trial. This court affirmed. Id. at 315.

1997 motion for a new trial. On May 22, 1997, the defendant filed another motion for a new trial, claiming his counsel had been ineffective because he employed peremptory challenges to strike women from the jury. In an unpublished

---

[5] "Nowick acknowledged that words in his affidavit such as 'invectives,' 'plagued,' 'relentless,' 'bombarded,' 'tainted,' and 'blatant,' were not in his customary vocabulary, and he disavowed the idea of proceedings suffused with racial epithets." Commonwealth v. Laguer, 36 Mass. App. Ct. at 312.

[6] Another juror denied racist remarks attributed to him by Nowick. That juror, however, attributed racist remarks to Nowick and to "one or two women jurors -- except there were no women on the jury." Commonwealth v. Laguer, 36 Mass. App. Ct. at 312.

[7] In an interview with the court's investigator Nowick stated that he "felt like he had been baited and hooked."

memorandum and order pursuant to our rule 1:28, we affirmed the denial of that motion by a different judge of the Superior Court, noting that the issue had been waived both at trial and in previous posttrial proceedings and that, rather than resulting from negligence or incompetence, striking women from the jury was evidently a strategic decision by counsel from which the defendant was likely to benefit in a trial involving "a violent and protracted sexual assault on a fifty-nine year old woman."  See Commonwealth v. Laguer, 46 Mass. App. Ct. 1108 (1999).

Motion for DNA testing.  On January 13, 2000, the defendant moved for DNA testing of the physical evidence.[8]  Due to the limited amount of biological material available for testing, another Superior Court judge ordered the DNA analyst to conduct the testing with great caution and described in thorough detail how the samples should be handled, transported, and divided. Both parties were allowed to designate a representative to observe any testing.

In two reports dated February 4, 2002 and March 21, 2002, the defendant's designated testing facility concluded that the

---

[8] DNA testing became available in the late 1980's and the Supreme Judicial Court first considered the admissibility of test results comparing the DNA of a criminal defendant with DNA found at a crime scene in Commonwealth v. Curnin, 409 Mass. 218 (1991).

defendant could not be eliminated as the source of the biological fluids found on the victim's pubic hair "because he possesses all of the obligate genotypes and/or alleles . . . identified in that" pubic hair sample.[9] The reports indicated that the array of possible genotypes from the tested pubic hair sample "occurs in less than one out of 100 million members of the Caucasian and Black populations and less than one out of 10 million members of the Mexican American population." The facility's reports therefore concluded that "[t]hese findings fail to support [the defendant]'s claim of factual innocence in the rape."

Admission of evidence tampering. At a parole board hearing held in 2003, the defendant admitted that in advance of his trial he had mixed his saliva with that of another inmate before being swabbed for testing. Commonwealth v. Laguer, 65 Mass. App. Ct. 612, 617 n.9 (2006).[10] The evidentiary impact of the falsified sample may be postulated from the fact that the pretrial testing produced inconclusive results, while a

---

[9] "Evidence that a defendant is not excluded could suggest to the jury that a 'link would be more firmly established if only more [sample] were available for testing.'" Commonwealth v. Cameron, 473 Mass. 100, 106 (2015), quoting from Commonwealth v. Nesbitt, 452 Mass. 236, 254 (2008).

[10] As noted above, after submitting the falsified saliva sample to the Commonwealth, the defendant argued in his 1989 motion for a new trial that his trial counsel had been ineffective for failing to obtain a blood test.

posttrial blood test found both the victim's and the defendant's blood types on a sock used to gag the victim.[11]

2004 motion for a new trial. The defendant filed another motion for a new trial on February 11, 2004 arguing that the Commonwealth failed to disclose an exculpatory fingerprint report prior to trial. The report in question indicated that four prints lifted from the telephone base, the cord of which was used to bind the victim's hands, did not match the defendant's fingerprints. See note 4, supra. The defendant obtained the report in 2001, by which time the back page of the report and the fingerprint impressions themselves were missing. Another Superior Court judge denied the motion; this court affirmed the denial, as did the Supreme Judicial Court on further appellate review. See Commonwealth v. Laguer, 65 Mass. App. Ct. 612 (2006); Commonwealth v. Laguer, 448 Mass. 585 (2007). The Supreme Judicial Court pointed out that "the lack of evidence that the fingerprints were left on the telephone at the time of the crime deprived them of probative value." Commonwealth v. Laguer, 448 Mass. at 592-593. See Commonwealth v. Laguer, 65 Mass. App. Ct. at 619-622. In addition to the

---

[11] The posttrial blood test indicated the defendant's blood type to be "B." The victim's blood type was "O." The trial judge, who ruled on the 1989 motion for a new trial, found that the posttrial test detected "both blood types 'O' and 'B' on the sock" used to gag the victim. Commonwealth v. Laguer, 410 Mass. 89, 92 (1991).

fact that the fingerprints did not exculpate the defendant, the record demonstrates that at trial the defendant took full advantage of the lack of available physical evidence linking him to the crime.[12]

Current motion for a new trial. On April 28, 2011, the defendant filed his most recent motion for a new trial, which was denied by the motion judge. The defendant's appeal from that denial is currently before us.

Discussion. Newly discovered evidence. The defendant based the current motion in part on the alleged statements of a newly discovered witness, Annie K. DeMartino. The defendant asserts that his representative discovered DeMartino's potential testimony long after trial either through meeting her coincidentally at a political fundraiser, or by reading an article in a local newspaper written by a reporter who interviewed her.[13]

---

[12] In his closing remarks to the jury, defense counsel emphasized: "There is not one piece of evidence, physical or otherwise, that puts [the defendant] in [the victim's] apartment." Commonwealth v. Laguer, 448 Mass. at 596. This argument, manifestly, was made possible in part by the contaminated saliva sample referenced above.

[13] The contradictory explanations how the defense acquired knowledge of DeMartino are contained in two separate documents. In his supplemental memorandum in support of the current motion, the defendant claims that his current counsel "coincidentally met [DeMartino] at a political fundraiser in the fall of 2006" where "DeMartino expressed that she knew of [the defendant]'s case." In his brief to this court, the defendant claims that

DeMartino's proffered testimony is presented in the form of two unsigned and unverified transcripts of taped interviews conducted by the defendant's representatives on February 13, 2007 and April 18, 2008.[14]  Her presumed testimony, gleaned from the transcripts, would be that she was a health care aide who assisted the victim at the halfway house where the victim resided for two years while suffering from aggravated mental distress following the crime.  This period encompassed the time of the trial; DeMartino was one of the caregivers who accompanied and comforted the victim in court.  In the transcripts, DeMartino alleges that the victim suffered from delusions and fear, frequently confusing other dark skinned males as her attacker.  DeMartino also alleges a friendship between the victim and an Hispanic male other than the defendant.

The motion judge determined that the proffered testimony could have been discovered with reasonable diligence at the time

---

"DeMartino was discovered by a member of the press" who "interviewed her . . . [and] wrote an article about it in a local paper in Worcester County."  After the defendant's counsel at the time "learned of this he arranged to interview [DeMartino] as well."

[14] In the transcript dated April 18, 2008 it is unclear who is interviewing DeMartino.  Both transcripts are unverified although the defendant was aware of the requirement to present DeMartino's testimony in the form of an affidavit and, according to the April 18, 2008 transcript, communicated this requirement to DeMartino herself.

of trial, see Commonwealth v. Grace, 397 Mass. 303, 305 (1986); Commonwealth v. LeFave, 430 Mass. 169, 176 (1999), and was also discoverable during the extensive period of posttrial proceedings recounted above, stating: "The prominence of the issue of [the victim's] competency, and the attention devoted to it by both counsel and the court, belies any argument that the defendant was not acutely aware of this issue." We agree; a single request for the identities of the victim's caregivers was all that was required.

The motion judge also found that "the purported testimony of DeMartino, as submitted in the motion record, lacks attributes of reliability." The statements are unsworn, indeed the transcripts are unsigned. Assuming DeMartino to be their source, there is no indication that she reviewed and approved the transcribed versions. We discern no error in the judge's determination, especially in the context of the prior proceedings and submissions.

The motion judge also concluded that there was no substantial risk that the proffered evidence, admitted at trial and credited by the jury, would have caused the jury to reach a different verdict. Commonwealth v. Lo, 428 Mass. 45, 53 (1998). The judge observed that the testimony would have shown, if anything, that while the victim was friendly with and unafraid of men of color prior to the attack, she became fearful of men

of color thereafter.  The judge did not err in finding that the defendant was not likely to benefit from such evidence.

DNA test results.  After successfully obtaining an order for DNA testing in 2001, the defendant now asserts that the inculpatory results entitle him to a new trial because they are based on a faulty testing procedure.  The motion judge found that there was no evidentiary support for the proposition that the testing was flawed.  Again, there was no error in the judge's ruling.  The allegation of potential migration of DNA from the defendant's clothing to the pooled sample of collected pubic hair and fluid samples is simply speculation based on the conclusory argument that the defendant is innocent.

Moreover, even if the postconviction DNA test results could be called into question, it would not constitute exculpatory evidence warranting a new trial.  "[D]isbelief of [evidence] does not constitute evidence to the contrary."  Kunkel v. Alger, 10 Mass. App. Ct. 76, 86 (1980).  Inculpatory DNA evidence was not introduced at trial; indeed, no such evidence was available in 1984.  The defendant was convicted on the basis of witness identification and circumstantial evidence sufficient to prove his guilt beyond a reasonable doubt.  Undermining the postconviction DNA test results do not detract from that

reality.[15] The motion judge did not err in concluding that discrediting the inculpatory DNA test result would not "cast[] real doubt on the justice of the conviction." Commonwealth v. Lo, 428 Mass. at 53, quoting from Commonwealth v. Grace, 397 Mass. at 305.

Alleged pretrial plea bargain offer. Among the exhibits offered in support of the current motion for a new trial, the defendant included a copy of a document purported to be a letter sent by the assistant district attorney in charge of the case (prosecutor) to his trial counsel agreeing to recommend a twenty-year sentence in exchange for a guilty plea.[16] The Commonwealth asserts, and the motion judge found, that the letter is "inauthentic." The former prosecutor has submitted an affidavit that states in relevant part: "I am certain that no plea offers were ever made to [the defendant]." The defendant's trial counsel submitted two affidavits, one on April 29, 2010 stating he had "discussed" a plea deal for a twenty-year

---

[15] This case does not fall into the category of cases in which a reversal of evidentiary reliability warrants a new trial. See, e.g., Commonwealth v. Liebman, 388 Mass. 483, 489 (1983) (discrediting key witness's testimony); Commonwealth v. Sullivan, 469 Mass. 340, 352 (2014) ("negat[ing] a key piece of physical evidence").

[16] The apparent import of this document is to support the defendant's claim that he was unwilling to plead guilty to a crime he did not commit, even if doing so would avoid the possibility of a life sentence.

sentence with the prosecutor, and one on September 6, 2011 specifying he had never received a formal plea offer in writing from the prosecutor.  In response to these sworn statements the defendant ineffectually asserts, without any basis, that "[i]t may be inferred that [his trial counsel] signed an affidavit drafted by prosecutors to advance their own agenda."  Leaving aside this document's irrelevance to any issue presented by the current motion for a new trial, we discern no reason to disturb the motion judge's finding that it is fraudulent.

Conclusion.  A motion for a new trial is addressed to the sound discretion of the judge.  Commonwealth v. Clerico, 35 Mass. App. Ct. 407, 411 (1993).  The judge's discretion includes the flexibility to consider the case as a whole, specifically "to consider in the interest of justice all evidence that might bear on the issues presented."  Commonwealth v. Grace, 397 Mass. at 312.  We conclude that the motion judge's dispassionate and careful consideration of the defendant's motion and of the lengthy history of this case resulted in the proper exercise of discretion, and that there was no error.[17]

> Order denying motion for new trial affirmed.

---

[17] In view of our assessment of the defendant's failure to support his motion for a new trial with credible evidence or a basis in law, we need not reach the motion judge's additional finding of fraud on the court.